STATE of Missouri, Respondent,

v.

Otis THOMPSON, Jr., Appellant.

No. 61790.

Supreme Court of Missouri, En Banc.

Nov. 22, 1983.

Bertram Cooper, St. Louis, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

B. Stephen Miller, St. Louis, amicus curiae.

WELLIVER, Judge.

The state by its motion requests this Court to recall its mandate issued in this case February 11, 1981, and enter judgment affirming, rather than reversing, Thompson's conviction for armed criminal action. We overrule the motion.

## I

Thompson was charged with first degree murder, armed robbery, and armed criminal action for his part in a robbery and killing at Cox's Cleaners in St. Louis on January 13, 1979. The jury acquitted him of first degree murder but convicted him of armed robbery and armed criminal action. The trial court found Thompson to be a "dangerous offender" and sentenced him to life in prison for armed robbery and ten years in prison for armed criminal action, with the sentences to run concurrently.

On appeal this Court affirmed the conviction and sentence for armed robbery. *State v. Thompson,* 610 S.W.2d 629, 638 (Mo.1981). The conviction for armed criminal action was reversed, *id.,* because at the time the appeal was decided our cases held that the fifth amendment proscription of double jeopardy prohibited imprisonment of a de-

fendant for both armed criminal action and the underlying felony when both crimes arose out of the same transaction, *see Sours v. State,* 603 S.W.2d 592 (Mo. banc 1980) (*Sours II*), *cert. denied,* 449 U.S. 1131, 101 S.Ct. 953, 67 L.Ed.2d 118 (1981); *Sours v. State,* 593 S.W.2d 208 (Mo. banc) (*Sours I*), *vacated and remanded,* 446 U.S. 962, 100 S.Ct. 2935, 64 L.Ed.2d 820 (1980). On October 5, 1981, the Supreme Court denied Thompson's petition for a writ of certiorari, which the state opposed. *Thompson v. Missouri,* 454 U.S. 840, 102 S.Ct. 148, 70 L.Ed.2d 122 (1981). The state did not cross-petition for certiorari on the double jeopardy issue.

The reasoning underlying the *Sours* line of cases was invalidated by the Supreme Court's decision on January 19, 1983, in *Missouri v. Hunter,* —— U.S. ——, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). On March 10, 1983, more than two years after our mandate issued in this case and nearly one and one-half years after the judgment became final when the Supreme Court denied review, the state filed the present motion requesting that we recall our mandate and, on the authority of *Hunter,* affirm Thompson's conviction for armed criminal action.

## II

■ Finality of litigation occupies an important place in the criminal justice process. *See, e.g., Engle v. Isaac,* 456 U.S. 107, 126–28, 102 S.Ct. 1558, 1570–71, 71 L.Ed.2d 783 (1982); *Schneckloth v. Bustamonte,* 412 U.S. 218, 262, 93 S.Ct. 2041, 2065, 36 L.Ed.2d 854 (1973) (Powell, J., concurring); *Sanders v. United States,* 373 U.S. 1, 24–25, 83 S.Ct. 1068, 1082, 10 L.Ed.2d 148 (1963) (Harlan, J., dissenting); *Gailes v. State,* 454 S.W.2d 561, 564 (Mo.1970). At some point litigation must cease. This precept applies with equal force to both society and the individual criminal defendant, *see Engle,* 456 U.S. at 127, 102 S.Ct. at 1571; *Sanders,* 373 U.S. at 24–25, 83 S.Ct. at 1082 (Harlan, J., dissenting), for both have an interest in obtaining a final and just resolution of criminal proceedings.

■ The principle of finality finds expression in the jurisdictional limitation imposed upon an appellate court once it finally decides a case and its mandate issues. This Court long ago held that once an appellate court transmits its mandate to the trial court, it divests itself of jurisdiction of the cause. *Gray Realty Co. v. Swinney,* 317 Mo. 687, 691, 297 S.W. 43, 45 (banc 1927). This comports with the general rule. *See, e.g., Riley v. Superior Court,* 49 Cal.2d 305, 309–10, 316 P.2d 956, 958–59 (1957); *Hagan v. Robert & Co.,* 222 Ga. 469, 470, 150 S.E.2d 663, 665 (1966); *Woodson v. Lee,* 74 N.M. 227, 228, 392 P.2d 419, 420 (1964); *Raht v. Southern Railway,* 215 Tenn. 485, 498, 387 S.W.2d 781, 787 (1965); *Reeploeg v. Jensen,* 81 Wash.2d 541, 546, 503 P.2d 99, 102 (1972), *cert. denied,* 414 U.S. 839, 94 S.Ct. 91, 38 L.Ed.2d 75 (1973). *See generally* Annot., 84 A.L.R. 579 (1933). The question, therefore, is the extent to which an appellate court may reacquire jurisdiction by recalling a mandate once issued. This Court has said that it possesses "the judicial power to recall a mandate for certain purposes," *Reimers v. Frank B. Connet Lumber Co.,* 273 S.W.2d 348, 349 (Mo.1954), but it has never fully delineated the scope of that power.

■ Other courts have held that a mandate once issued may not be recalled absent one of a few specific exceptions, such as when the judgment is the result of prejudicial mistake of fact or of fraud, when there is irregularity or error in the issuance of the mandate, or when the mandate does not correctly reflect the judgment rendered by the court. *See, e.g., People v. Stone,* 93 Cal.App.2d 858, 860, 210 P.2d 78, 79–80 (1949); *Tyson v. Whitaker & Son,* 411 A.2d 389, 390 (Me.1980); *Reeploeg,* 81 Wash.2d at 546, 503 P.2d at 102–03. *See generally* 5B C.J.S. *Appeal & Error* § 1996, at 650–51 (1958). In the criminal context, a

> motion for recall of the remittitur is not the proper remedy to correct a mere mistake of law, even though one exits....
>
> ....
>
> Ordinarily, when a court has jurisdiction to render a judgment which is not the result of fraud, imposition or prejudicial mistakes of facts, a remittitur which has been duly issued thereon may not be

recalled or quashed to correct mere errors of law or procedure.

*Stone,* 93 Cal.App.2d at 860, 210 P.2d at 79–80.

■ Whenever the judgment of an appellate court impinges upon the federal constitutional rights of the accused, however, the mistake cannot be said to be a "mere [error] of law or procedure." *Id.* at 860, 210 P.2d at 80. Consequently, our courts have properly recognized that a mandate may be recalled in order to remedy a deprivation of the federal constitutional rights of a criminal defendant. For example, a motion to recall the mandate may be employed to seek reconsideration of an appellate court's affirmance of a conviction when a criminal defendant alleges ineffective assistance of counsel on appeal, *State v. Rone,* 603 S.W.2d 575, 578 (Mo. banc 1980); *Hemphill v. State,* 566 S.W.2d 200, 208 (Mo. banc 1978), or when a defendant has been deprived of appellate counsel altogether, *see State v. Schaffer,* 383 S.W.2d 698, 700 (Mo. 1964). Such a motion may also be employed when the decision of a lower appellate court directly conflicts with a decision of the United States Supreme Court upholding the rights of the accused. *See State v. McReynolds,* 581 S.W.2d 465 (Mo.App.1979); *State v. Nevels,* 581 S.W.2d 138 (Mo.App.1979).

■ The present case, however, is not one in which the rights of the defendant have been abridged. Instead, our original decision was in favor of the liberty of the accused with respect to the conviction for armed criminal action. That decision was final.[1] To reopen the proceedings now would subvert the policies the principle of finality is designed to further. "To require courts to consider and reconsider cases at the will of litigants would deprive the courts of that stability which is necessary in the administration of justice." *Kosten v. Flemming,* 17 Wash.2d 500, 504, 136 P.2d 449, 451 (1943). A criminal defendant should not be burdened with the concern that long after proceedings against him are closed, a change in the substantive law or in the composition of the court that granted him his liberty might again render him amenable to imprisonment at the instance of the state.

This case does not fall within any of the exceptions to the general rule that a mandate once issued may not be recalled. The mandate in this case therefore cannot and should not be recalled.

■ The state relies on *McReynolds* and *Nevels,* but those cases are inapposite. Both involved the recall of mandates affirming convictions obtained in violation of *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), and were decided after the Supreme Court in *Lee v. Missouri,* 439 U.S. 461, 99 S.Ct. 710, 58 L.Ed.2d 736 (1979), expressly made the holding in *Duren* retroactive to the date of the decision in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Whether a construction of the United States Constitution is to be applied retroactively or prospectively depends upon the Supreme Court's view of the facts and circumstances of each particular case, *see United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982), but no such question is here involved. It suffices to say that neither *McReynolds* nor *Nevels* involved an attempt by the state to deprive a defendant of his liberty after it had once been duly granted him.

1. There is no question that the decision of this Court was final. The Supreme Court has defined a final judgment in this context as one in which a conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari elapsed or a petition for certiorari finally denied. *See United States v. Johnson,* 457 U.S. 537, 542 n. 8, 102 S.Ct. 2579, 2583 n. 8, 73 L.Ed.2d 202 (1982); *Tehan v. United States ex rel. Shott,* 382 U.S. 406, 409 n. 3, 86 S.Ct. 459, 461 (1966); *Linkletter v. Walker,* 381 U.S. 618, 622, 85 S.Ct. 1731, 1733, 14 L.Ed.2d 601 n. 5 (1965). In this case the Supreme Court denied Thompson's petition for certiorari, *Thompson v. Missouri,* 454 U.S. 840, 102 S.Ct. 148, 70 L.Ed.2d 122 (1981), and the state made no effort to seek certiorari on the double jeopardy issue as it had done in most other cases posing the same question, *see Missouri v. Hunter,* —— U.S. ——, 103 S.Ct. 673, 677, n. 4, 74 L.Ed.2d 535 (1983).

The motion to recall the mandate is over-ruled.

HIGGINS and DONNELLY, JJ., concur.

BLACKMAR, J., concurs in result in separate opinion filed.

RENDLEN, C.J., and BILLINGS, J., dissent in separate opinions filed.

GUNN, J., dissents and concurs in separate dissenting opinion of BILLINGS, J.

BLACKMAR, Judge, concurring in result.

I would not dispute the Chief Justice's assertion that the Supreme Court of the United States, in remanding several of our cases for reconsideration in light of *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981), gave a clear indication that our opinion in *Sours I* (*Sours v. State,* 593 S.W.2d 208 (Mo. banc 1980), *vacated,* 446 U.S. 962, 100 S.Ct. 2935, 64 L.Ed.2d 820 (1980)), did not correctly state the law of double jeopardy under the federal Constitution, and that the denial of certiorari in *Sours II* (*State v. Sours,* 603 S.W.2d 592 (Mo. banc 1980), *cert. denied,* 449 U.S. 1131, 101 S.Ct. 953, 67 L.Ed.2d 118 (1981)), was attributable to circumstances peculiar to that case, rather than indicating that this Court had correctly resolved the issue which was the occasion for remand.[1] Nor would I disagree with the assertion that there was no reasonable expectation that the decision on rehearing in *State v. Haggard,* 619 S.W.2d 44, 49 (Mo. banc 1981), *cert. denied,* 455 U.S. 930, 102 S.Ct. 1297, 71 L.Ed.2d 474 (1982), would be sustained on further review.

In the present case, however, motion for rehearing was denied on February 9, 1981, before the remand in *Missouri v. Counselman,* 450 U.S. 990, 101 S.Ct. 1690, 68 L.Ed.2d 190 (March 23, 1981), had been ordered. The state could have filed a petition for certiorari within 60 days following the denial of rehearing, and could have secured an extension of up to 30 days. (U.S.Sup.Ct. Rule 20.1). No petition was filed by the state.

The state had another opportunity when the defendant-appellant filed his petition for certiorari. By Rule 19.5 of the Supreme Court of the United States a cross petition could have been filed within 30 days of the filing of the defendant's petition, even though an initial petition would have been out of time. Filing the cross petition would be very simple since most of the record documents are required to be printed as appendices to the defendant's petition.

The *Counselman* remand indicates that either an initial petition or a cross petition would undoubtedly have been granted. The state, instead, acquiesced in the final disposition of the case through denial of the defendant's petition. The state may have felt that the Supreme Court would be more willing to grant the defendant's petition if the state were also to seek review. Perhaps the state felt that any risk of opening up the case was not worth the possible benefits, in view of the severe sentence which was affirmed. Whatever the motive, however, the signals were not so clear at the time this Court initially acted on the case, and I believe that the move was the state's in seeking further review.

For the reasons stated I agree that the motion to recall the mandate should be overruled. It is not necessary to discuss other possibilities.

RENDLEN, Chief Justice, dissenting.

For the reasons following, I respectfully dissent.

On January 13th, 1979, Otis Thompson at gunpoint robbed Donald Dickerson, an employee of a cleaning shop. He was tried and convicted of first degree robbery and armed criminal action on July 13, 1979, and in October of that year was sentenced as a

---

1. Certiorari was denied in *Sours II,* 449 U.S. 1131, 101 S.Ct. 953, 67 L.Ed.2d 118, on January 26, 1981, after the opinion in this case was handed down on January 15, 1981, but before the denial of rehearing. The majority of the Supreme Court did not flag mootness as the occasion for the denial. This persuades me that the state should have assumed the burden of seeking further review.

dangerous offender to life imprisonment for robbery and ten years for armed criminal action.[1] Robbery and armed criminal action were then and at all times since have been discrete statutory crimes, each accompanied by a separate punishment provision. The punishment ordered for Thompson fell within the prescribed statutory range. It should be emphasized that Thompson was convicted and sentenced for both crimes in a *single trial*. When Thompson was sentenced (1979) the definitive statement in vogue regarding Double Jeopardy was found in the 1977 decision of *State v. Treadway*, 558 S.W.2d 646 (Mo. banc 1977). Faced in that case with a constitutional challenge of Double Jeopardy, this court approved convictions and punishments in a single trial for the simultaneously committed crimes of (1) robbery and (2) armed criminal action: "[M]ultiple convictions are permissible if the defendant has in law and in fact committed separate crimes." *Id.* at 651, *citing State v. Toombs*, 326 Mo. 981, 34 S.W.2d 61, 64 (1930). Further, without question, the Legislature intended defendant Treadway's offenses to be treated as separate crimes and that the court so found.[2] Thus, since *Treadway* if the Legislature prescribed convictions and punishments for both crimes, then a court's imposition of such convictions and sentences would be valid. In its holding, this court swept aside Donald Treadway's argument that such convictions violated Missouri's Constitutional prohibitions against placing a person again in jeopardy for an offense after once being *acquitted* for that offense. 558 S.W.2d at 651, *citing* Mo. Const. Art. I, § 19. The court in *Treadway* added that the prohibition against Double Jeopardy

precluding a second *conviction* for the same offense (as forbidden by Missouri's common law and by the Fifth Amendment to the United States Constitution, applicable to the states via the Fourteenth Amendment) had not been violated when the defendant received two separate sentences for two separate crimes. 558 S.W.2d at 651. In the case at bar, Otis Thompson knew, by virtue of *Treadway,* that neither the Missouri Constitution nor the federal Constitution invalidated his conviction or sentences on Double Jeopardy grounds. At the time of his conviction and sentencing, it could not have been said that Thompson had any reasonable expectation of being constitutionally relieved of his conviction or sentence for armed criminal action. Thereafter, this court in Sours I (Jan. 1980) attempted to engraft a new and untenable interpretation of the Double Jeopardy provision onto the federal Constitution's Double Jeopardy Clause. However, this temporary breach was promptly repaired on April 16, 1980, when the Supreme Court of the United States decided *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (April 6, 1980). In *Whalen* the Supreme Court stated: "The Double Jeopardy Clause at the very least precludes federal courts from imposing consecutive sentences *unless authorized by Congress to do so."* *Id.* at 689, 100 S.Ct. at 1436. (Emphasis added.) Driving home its point the Court continued: "the legislative power, including the power to define criminal offenses and to prescribe the punishments to be imposed . . . resides wholly with the Congress." *Id.* The import of *Whalen* was that although the Double Jeopardy Clause prohibited *courts* from assessing double punishment for the same

---

1. Thompson was acquitted on a charge of having murdered John Cox, a brother of the proprietor of the cleaning shop where Donald Dickerson was robbed.

2. Although a host of our later cases, beginning with *Sours v. State* 593 S.W.2d 208 (Mo. banc 1980) (*Sours I*) (see discussion below) contradicted *Treadway,* the majority in *Sours I* conceded that the Legislature intended that convictions for both crimes were possible and that punishment for both was permissible. "The General Assembly clearly intended that both

[the armed criminal action statute] and the statute defining the underlying felony be applied to a defendant in a prosecution arising out of a single transaction." *Id.* at 216. This admission was reiterated in *State v. Sours,* 603 S.W.2d 592, 598 (Mo. banc 1980) (*Sours II*) and again in the opinion issued on motion for rehearing in *State v. Haggard,* 618 S.W.2d 44, 51 (Mo. banc 1981). In this connection, it should be noted that the author of the above three opinions authored the majority opinion in the case at bar.

acts when not so authorized by the Legislature, the Clause did not prohibit the *Legislature* from statutorily prescribing more than one sentence for the same acts and establishing separate crimes. Therefore, if the Legislature authorized such double punishment, a court would not violate the Double Jeopardy Clause by meting out the punishment prescribed.

At the very time the Supreme Court decided *Whalen* it was also considering certiorari to review *State v. Sours,* 593 S.W.2d 208 (Mo. banc 1980) (hereafter *Sours I*). On May 27, 1980, any lingering question as to whether *Whalen* was the controlling law was dispelled when the Supreme Court vacated and remanded *Sours I* "for further consideration in light of *Whalen* ...." *Missouri v. Sours,* 446 U.S. 962, 100 S.Ct. 2935, 64 L.Ed.2d 820 (1980). However, in August of 1980 this court in *State v. Sours,* 603 S.W.2d 592 (Mo. banc 1980) (hereafter *Sours II*), refused the teachings of *Whalen* and again declared that Scott Sours' conviction for both robbery and armed criminal action constituted a violation of this court's notion of the United States Constitution's Double Jeopardy provision. Certiorari was again applied for, but before the United States Supreme Court could take action, Scott Sours was released from the penitentiary. Thus, on January 26, 1981, certiorari was denied, although it should be noted that because of Sours' release, two of the reporting judges would have dismissed the petition "as moot." 449 U.S. 1131, 101 S.Ct. 953, 67 L.Ed.2d 118 (January 26, 1981). However, in less than two months the United States Supreme Court's decision in *Albernaz v. U.S.,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (March 9, 1981), removed any basis for doubt that this court had indeed been erroneously interpreting the Fifth Amendment. The defendants in *Albernaz* had been convicted of conspiracy to *import* marijuana [count I] and conspiracy to *distribute* marijuana [count II]; each count was in violation of a separate provision of the United States Code. The defendants had received consecutive sentences on each count, and the United States Supreme Court granted certiorari to deter-

mine whether "Congress intended consecutive sentences to be imposed for the violation of those two conspiracy statutes and, if so, whether such cumulative punishment violates the Double Jeopardy clause of the Fifth Amendment of the United States Constitution." *Id.* at 335, 101 S.Ct. at 1140. The Court pointed out that it was confronted with separate offenses with separate penalty provisions contained in "distinct subchapters of the act." *Id.* at 336, 101 S.Ct. at 1141. The Court went further and cited *Brown v. Ohio:*

> "[w]here consecutive sentences are imposed at a single criminal trial, the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." 432 U.S., at 165 [97 S.Ct., at 2225]. Thus, the question of what punishments are constitutionally permissible is not different from the question of what punishment the Legislative Branch intended to be imposed. Where Congress intended, as it did here, to impose multiple punishments, imposition of such sentences does not violate the Constitution.

*Albernaz,* 450 U.S. at 344, 101 S.Ct. at 1145. There can be no doubt that this, in the clearest language, made manifest that it was permissible for the Legislature of Missouri to authorize the conviction for separate crimes and the imposition of separate punishments in a single trial. But somehow a majority of this court could not be dissuaded from its intention of striking down armed criminal action convictions in Missouri. In *State v. Haggard,* 619 S.W.2d 44 (Mo. banc July 14, 1981), this court in the opinion issued on motion for rehearing, reaffirmed the proposition expressed in *Sours II*—namely, that by enactment of these two statutes, the Missouri Legislature intended to twice punish the appellant, but again erroneously insisted that such multiple punishments for the same offense arising out of the same transaction violated the majority's mistaken view of Double Jeopardy. *Haggard,* 619 S.W.2d at 51. Thus, notwithstanding the United States Supreme

Court's pronouncements in *Albernaz*, this court reversed *Haggard's* conviction for armed criminal action. This court's mistaken view concerning the meaning of Double Jeopardy as repeated in *Haggard* was again stripped away when *Haggard* was vacated and remanded on February 22, 1983, for further consideration in light of *Missouri v. Hunter*, 459 U.S. ——, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). In the meantime, the United States Supreme Court, acutely aware of Missouri Supreme Court's refusal to yield to federal mandates, granted certiorari from one of the many cases in our Court of Appeals for which armed criminal action convictions had been vacated because of *Sours*. Through its decision in *Hunter*, decided on January 19, 1983, the Supreme Court made it impossible for this court to continue any pretense that its mistaken notion of Double Jeopardy was valid. Chastising this court, the Chief Justice speaking for the Court stated that our *Haggard* ruling "manifests a misreading of our cases on the meaning of the Double Jeopardy Clause of the Fifth Amendment." *Hunter*, 459 U.S. at ——, 103 S.Ct. at 677. Further emphasizing this point, the Court stated: "with respect to cumulative sentences imposed in a *single trial* the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." (Emphasis added.) *Id.* at ——, 103 S.Ct. at 678. Observing that the Missouri Supreme Court had construed the two statutes at issue as defining the same crime, and that the Missouri Supreme Court had recognized that the Legislature intended cumulative punishment for violations of the statutes, the Court accepted the Missouri court's construction of the Missouri statutes. *Id.* at ——, 103 S.Ct. at 679, *citing O'Brien v. Skinner*, 414 U.S. 524, 531, 94 S.Ct. 740, 743, 38 L.Ed.2d 702 (1974). But, the Court went on to state "we are not bound by the Missouri Supreme Court's legal conclusion that these two statutes violate the Double Jeopardy Clause, and we reject its legal conclusion." *Id.* In summary, the Court stated that where a Legislature specifically authorizes cumulative punishment under two statutes, "a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a *single trial.*" *Id.* at ——; 103 S.Ct. at 679. (Emphasis added.)

The case at bar does not involve retrospective application of new interpretations of Constitutional law. Nor is there here a question of finality.

The rulings in *Hunter*, presaged by the decision in *Whalen*, the reversal of *Sours I*, and the decision in *Albernaz*, came as no surprise. Hence, Otis Thompson was validly convicted and sentenced; under the existing law, and only in the first four months of 1980 (between *Sours I* and *Whalen*) could Thompson have expected his sentence to have been altered. The possibility was dispelled by *Whalen*, and put to rest in the summer of 1980 when *Sours I* was reversed and remanded. In the months that followed, the United States Supreme Court repeatedly reinforced its ruling in *Whalen* and its reversal of *Sours I*. The majority in the case at bar somehow treats this as something different from what it is, by assuming that *Hunter* effected a *"change"* in the law that reaches back to harm defendant Thompson. Such is not the case; instead, the meaning of Double Jeopardy under *Hunter* is identical to the meaning that prevailed (both in federal and in state courts) before, at the time and after Thompson's trial and conviction. It was our court under *Sours I* that attempted to change the meaning of the Fifth Amendment of the United States Constitution, however, under the Supremacy Clause, this court's brief flirtation with that erroneous interpretation should have been immediately corrected by this court in *Sours II* during the summer of 1980. However, in *Sours II* this court again refused to properly apply federal Double Jeopardy Doctrine. Had this court properly applied the law, there would have been no reversal of Thompson's armed criminal action conviction in January of 1981. Therefore, applying *Hunter's* principles to Otis Thompson does not constitute a retrospective application of a

"*change*" in Constitutional law, for there was no "*change*." The Fifth Amendment, as interpreted by the United States Supreme Court, was the same at the time of Thompson's conviction as it is now: Double Jeopardy did not and does not prohibit the imposition of multiple sentences for the same acts because the Legislature has so provided by statute.

Furthermore, this is not a question to be swept under the shibbolith of "finality." The finality argument could have application only if there has been a change in constitutional interpretation and a new doctrine announced by the Supreme Court. Such is not the case; instead we have a situation in which this court was briefly mistaken as to the meaning of the Constitution and now refuses to recognize or remedy that mistake.

Finally, I address the question of the equities involved. This defendant is presently incarcerated under his life sentence; there was no justifiable legal or constitutional basis for reversing his armed criminal action conviction.

In this setting the majority admits that this court possesses the judicial *power* to recall the mandate in this case. Majority Opinion at 3, citing *Reimers v. Frank B. Connet Lumber Co.,* 273 S.W.2d 348, 349 (Mo.1954). The final question is one of judicial policy. Should this court correct its mistake after the time of certiorari petition to the United States Supreme Court has elapsed or such petition is denied? I submit that in the strange context created by this court's decisions, a judgment, based on an erroneous constitutional interpretation that occurred repeatedly and affected more than one hundred identifiable cases, should be reviewed.

Since 1976, when the armed criminal action statute was enacted, 1976 Mo.Laws 780, the General Assembly has persistently endeavored to deter violent crime by imposing more severe punishment on those convicted of committing crimes with dangerous or deadly weapons. The General Assembly's intent to impose additional punishment for commission of a felony with a dangerous or deadly weapon could not be more clear. Section 571.015 provides that "any person who commits any felony . . . by, with, or through the use, assistance, or aid of a dangerous or deadly weapon *is also guilty of the crime of armed criminal action.*" (Emphasis added.) Three times the statute in its several sections declares, "[t]he punishment imposed pursuant to this subsection shall be *in addition to* any punishment provided by law for the crime committed by, with or through the use, assistance or aid of a dangerous or deadly weapon." Section 571.015, RSMo 1978. (Emphasis added.) When, in 1981, a majority of this court somehow expressed doubt as to the legislative intent to punish for both crimes, *State ex rel. Westfall v. Ruddy,* 621 S.W.2d 42, 45 (Mo. banc 1981), the General Assembly immediately reacted in terms unsusceptible to misinterpretation. Section 571.017, RSMo Cum.Supp.1982 provides: "Nothing contained in any other provision of law, except as provided in subsection 5 of section 571.105, shall prevent imposition of sentences for both armed criminal action and the crime committed by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon." For the past three years, however, the General Assembly's persistent efforts to protect Missouri citizens have been as persistently frustrated by this court's decisions, which have caused a dendritic growth of cases in our court of appeals, the roots of which have choked the intentions of our Legislature. Just when it appears that *Missouri v. Hunter,* —— U.S. ——, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), has ended this court's continued opposition, the majority would throw a new obstacle under the guise of "finality" into the legislation's path. Such obstruction is unnecessary, and the recrudescence of *Sours*—however slight—is contrary to sound judicial policy.

Defendant was lawfully convicted and sentenced for committing a felony with a deadly weapon, and there was no justifiable legal or constitutional basis for this court's reversal of his armed criminal action conviction. He is presently incarcerated, serving

the life sentence for first degree robbery; equitable considerations therefore do not militate against affirming the companion conviction of armed criminal action. Finally, affirmance would finally permit effectuation of the General Assembly's effort to deter violent crime by more severely punishing those convicted of committing felonies with dangerous or deadly weapons. It is not this court's role to support or oppose legislation, however, it is our role to enforce such legislation if constitutionally permissible. In refusing to impose the punishment legislatively mandated I submit the court, has erred, for it should not set itself as superior to the people's elected representatives in establishing public policy.

For the reasons stated, I would recall the mandate issued in defendant's case February 11, 1981, and enter judgment affirming defendant's conviction for armed criminal action.

BILLINGS, Judge, dissenting.

I dissent. The past 15 or 20 years of post-conviction proceedings, particularly federal habeas corpus, have convinced me there is simply no such thing as *finality* in the criminal law arena. I suggest the finality of this Court's affirmance of defendant's life sentence for robbery will shortly be tested under our Rule 27.26 and, if relief is not forthcoming, the final judgment of Missouri's highest court will be re-opened and re-examined by our federal brethren by way of habeas corpus.

In *Sours I,* and the cases it spawned, this Court misinterpreted and misapplied existing, substantive, federal constitutional law. Following that line of cases, this Court in 1981 reversed defendant's armed criminal action conviction. Because the reversal was bottomed squarely on federal constitutional law and *Missouri v. Hunter,* —— U.S. ——, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), declared *Sours I* and its progeny to have resulted from "[A] misreading of our cases on the meaning of the Double Jeopardy Clause of the Fifth Amendment . . . ." (103 S.Ct. at 677), the present Court should not hesitate to bite the bullet of prior marksmen and recall the mandate and affirm defendant's armed criminal action conviction.

The principal opinion correctly observes that both society and the individual criminal defendant have an interest in obtaining a final and just resolution of criminal proceedings. I agree, but suggest the scales of justice should not be counter-balanced in favor of either society or the defendant. If we have the power to recall mandates to balance the scales for the defendant, then we should have the same power to recall mandates to balance them for society's interests. A *just* resolution in this case dictates recall of the mandate. The *final* resolution of these criminal proceedings are probably light years away.