# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-3067WM

_____

James W. Chambers,

          Appellant,

    v.

Michael Bowersox, Warden,

          Appellee.

\*
\*
\*
\*
\* On Appeal from the United
\* States District Court
\* for the Western District
\* of Missouri.
\*
\*
\*

_____

Submitted: June 8, 1998

Filed: September 23, 1998

_____

Before RICHARD S. ARNOLD and MORRIS SHEPPARD ARNOLD, Circuit Judges, and PANNER,[1] District Judge.

_____

RICHARD S. ARNOLD, Circuit Judge.

James Wilson Chambers was convicted of capital murder and sentenced to death for killing Jerry Oestricker. He appeals the District Court's[2] denial of his petition for

_____

[1]The Hon. Owen M. Panner, United States District Judge for the District of Oregon, sitting by designation.

[2]The Hon. Howard F. Sachs, United States District Judge for the Western District of Missouri.

writ of habeas corpus under 28 U.S.C. § 2254 (1994). We have reviewed the claims that have been certified as appealable, and we now affirm.

## I.

On May 29, 1982, Chambers and his family, celebrating the Memorial Day week end, were camped near the Meramec River in Arnold, Missouri. Because Chambers's two step-sons wanted to go out onto the river to fish, early that evening Chambers sought to borrow a boat from friends, members of the Turner family. He set out to find the Turners, accompanied by his cousin, Donny Chapman, and Chapman's girlfriend, Eleanor Hotchkiss. After stopping by Chambers's home, the three went to the Country Club Lounge, located on the other side of the river from their campsite. Earlier, at the lounge, one of the Turners, Jack, had gotten into an argument with Jerry Oestricker after Oestricker had walked past Jack and bumped his chair. The owner of the bar was summoned from home, and he asked the Turners and Oestricker to leave. The Turners eventually complied, although Oestricker did not. By the time Chambers arrived, the Turners were gone, and Chambers left the bar without incident.

Chambers, Chapman, and Hotchkiss then went to the Turners' nearby home. There, Chambers asked about borrowing their boat and was told that the boat was dry-docked, but that a neighbor had one that Chambers might be able to borrow. Jack Turner got into the car with Chambers, Chapman, and Hotchkiss, and they returned to the Country Club Lounge to find the neighbor. On the way to the bar, according to Chapman, Turner discussed the earlier incident involving Oestricker. When they arrived at the bar, Chambers and Turner went inside, leaving Chapman and Hotchkiss in the car. Chambers had with him a .38-caliber pistol that he had gotten from his home when he, Chapman, and Hotchkiss first left the campsite. Inside, Chambers approached Oestricker, and asked Oestricker to buy him a drink. Oestricker said he would not, and an argument ensued. The bar owner asked them either to stop arguing

or leave, and Chambers walked to the door, saying, "Come on out, you motherfucker. We'll settle this outside." Oestricker then followed Chambers out of the bar.

What happened next is the subject of considerable dispute. According to the State, Chambers fatally shot Oestricker as soon as Oestricker emerged from the bar. A witness testified that Chambers said, "Take that," as he fired the gun at Oestricker. He then repeatedly struck Oestricker on the face with the gun, and, as Oestricker fell, said, "Lay there and die." Chambers then dragged Oestricker out of the doorway and shouted into the bar, "The rest of you motherfuckers want some of this?" Chambers got into the waiting car, and the car drove off. According to the defense theory, once Chambers and Oestricker were outside, they faced each other briefly and exchanged words. Oestricker then struck Chambers, knocking him back into a truck and onto the ground. Oestricker moved toward Chambers, and Chambers shot him in self-defense. The jury accepted the State's version of the facts. No one claims that the evidence was not sufficient to support this verdict.

## II.

Three separate juries have found Chambers guilty of capital murder, and he has been sentenced to death after each trial. His first conviction was reversed by the Missouri Supreme Court on the basis of the trial court's refusal to instruct the jury on self-defense. State v. Chambers, 671 S.W.2d 781 (Mo. 1984) (en banc). Chambers's second conviction was affirmed by the Missouri Supreme Court in State v. Chambers, 714 S.W.2d 527 (Mo. 1986) (en banc). He filed a Mo. Sup. Ct. R. 27.26 postconviction motion, which was denied by the circuit court. The Missouri Court of Appeals affirmed. Chambers v. State, 745 S.W.2d 718 (Mo. App. 1987). Chambers then sought habeas relief under 28 U.S.C. § 2254. His petition was denied by the District Court. A panel of this Court reversed that judgment in Chambers v. Armontrout, 885 F.2d 1318 (8th Cir. 1989), holding that Chambers's trial counsel provided ineffective assistance when he failed to interview or call a witness who could

-3-

have testified in support of Chambers's theory of self-defense.  The State sought rehearing en banc, which was granted.  The full Court agreed with the panel and directed the District Court to enter an order requiring that Chambers be retried or freed. Chambers v. Armontrout, 907 F.2d 825 (8th Cir.) (en banc) (6-5 decision), cert. denied, 498 U.S. 950 (1990).  Chambers was tried and convicted a third time, and again sentenced to death in 1992.  He filed a motion for postconviction relief under Mo. Sup. Ct. R. 29.15, and the circuit court denied relief.  His conviction, sentence, and the denial of postconviction relief were all affirmed by the Missouri Supreme Court in State v. Chambers, 891 S.W.2d 93 (Mo. 1994) (en banc).  The petition for writ of habeas corpus before us now was filed in 1995, and amended in 1996.  The District Court denied relief in 1997, and thereafter issued a certificate of appealability with respect to six of petitioner's claims.

## III.

Chambers's first claim centers on testimony given by his probation officer during the sentencing phase of the third trial.  The officer testified that Chambers had told him that one of the regrets of his life was not having had a chance to kill a police officer. According to the probation officer's testimony, the statement came about in the following way.  The probation officer visited the Jefferson County jail, where Chambers was being held, shortly after Chambers's first conviction.  The officer did not go to the jail to see Chambers, but to see another inmate, in the course of his official duties.  The visit took place sometime between December 16 and December 23, 1982.  At that point, the probation officer's written presentence investigation report had apparently already been completed and submitted to the trial court.  The report was submitted on December 16, and petitioner's formal sentencing took place on December 23.  At any rate, during the visit, according to the probation officer's testimony, Chambers called the officer over to his cell and engaged him in conversation.  Chambers told the officer that he had some regrets about his life.  When the officer asked what they were, Chambers replied that he regretted not having had a

chance to kill a police officer. The official presentence investigation report does not mention this statement, but the probation officer did inform the trial judge about it, orally. In addition, the probation officer testified to this statement, without objection from Chambers, during Chambers's second trial. Neither was there any objection to the testimony about the statement during the penalty phase of the third trial.

Chambers now argues that this testimony was inadmissible under Mo. Rev. Stat. § 217.780 (1982), recodified at Mo. Rev. Stat. § 559.125 (1990).[3] This statute provided that:

> Information and data obtained by a probation or parole officer shall be privileged information, and shall not be receivable in any court. Such information shall not be disclosed directly or indirectly to anyone other than the members of a parole board and the judge entitled to receive reports, except the court may in its discretion permit the inspection of the report, or parts thereof, by the defendant, or prisoner or his attorney, or other person having proper interests therein, whenever the best interest or welfare of a particular defendant or prisoner makes such action desirable or helpful.

It is important to have in mind the procedural history of Chambers's objections to this testimony. On direct appeal, Chambers argued that the evidence was irrelevant to any aggravating circumstance submitted to the jury, and that it was "inadmissible evidence of bad character and future dangerousness." State v. Chambers, 891 S.W. 2d 93, 106-07 (Mo. 1994) (en banc). The Missouri Supreme Court reviewed both of these arguments on a plain-error basis, no objection to the testimony having been made at

---

[3]The statute was amended by Laws 1995, H.B. No. 424, § A, and is now codified as Mo. Rev. Stat. § 559.125.2. The amendment is not material to any of the issues in this case.

trial. The Court held that no plain error had occurred, because the evidence was admissible. Any evidence regarding the defendant's character is admissible at the penalty phase, including "[c]haracter and future dangerousness evidence . . .." Id. at 107. In addition, the Court observed that evidence of the statement had been introduced at a previous trial, so that "Chambers was clearly on notice that the State would introduce it." Ibid. The probation-officer statute we have just quoted was not argued to the Missouri Supreme Court, and the Court's opinion does not mention it. In fact, the statute was never cited to any state court until after the present federal habeas corpus proceeding had been commenced. At that point, Chambers filed a motion in the Missouri Supreme Court for recall of that Court's mandate, arguing that his counsel on direct appeal had been ineffective for not contending that the admission of the evidence in question was plain error under the statute. The Missouri Supreme Court denied this motion without comment.

Chambers makes a number of arguments against the admission of this evidence: (1) that admission of the evidence in violation of the state statute deprived him of his right under the Due Process Clause of the Fourteenth Amendment to the proper application of state law in capital proceedings; (2) that admission of the statement deprived him of his right against self-incrimination (no Miranda warnings having been given) and of his right to counsel (Chambers being represented by counsel at the time he made the statement); (3) that the statement was so inflammatory and prejudicial that it violated his right to a rational sentencing process under the Eighth Amendment; and (4) that his appellate counsel was ineffective for not arguing to the Missouri Supreme Court that the statement was inadmissible, as a matter of state law, under the probation-officer statute. We address each of these arguments in turn.

We discuss first what might be called petitioner's "pure" due process claim – "pure" because it relies on the Due Process Clause of the Fourteenth Amendment simpliciter, and not on that Clause's incorporation of any of the specific provisions of the Bill of Rights. The argument is simply this: the testimony of probation officer

Johnston was received in violation of the Missouri statute, petitioner had a right to expect that the statute would be properly applied, and, since that did not occur, he has been deprived of due process of law. Another way of putting it is to say that petitioner had a "liberty interest" in the enforcement of the statute, which, in his view, mandated exclusion of the evidence. We cannot accept this argument.[4]

We have held many times that a mere violation of state law is not the automatic equivalent of a violation of the federal Constitution. E.g., Meis v. Gunter, 906 F.2d 364, 369 (8th Cir. 1990) ("A violation of state law, without more, is not the equivalent of a violation of the Fourteenth Amendment."). A long line of Supreme Court cases is to the same effect. E.g., Snowden v. Hughes, 321 U.S. 1, 11 (1944). Hicks v. Oklahoma, 447 U.S. 343 (1980), the principal authority petitioner cites, must be read against this general background. In Hicks, a jury, in accordance with the habitual-offender statute then in effect in Oklahoma, had sentenced a defendant to a mandatory term of 40 years in prison. While the case was on appeal, the habitual-offender statute was held unconstitutional in another case. When Hicks's case came before the appellate court, however, his conviction and sentence were nevertheless affirmed, the Court reasoning that the sentence was, in any event, within the outer limit that the jury could have imposed. Our own case of Rust v. Hopkins, 984 F.2d 1486, 1492-95 (8th Cir. 1993), perhaps expands Hicks somewhat, but not enough to reach the circumstances presented in Chambers's case. In Rust, a three-judge sentencing panel had imposed a sentence of death without finding aggravating circumstances beyond a reasonable doubt, as required by state law. We held that the error had not been cured

---

[4]The State argues that the point is procedurally barred for a number of reasons, and it may be right. In this instance, as in the case of some of the other arguments advanced by petitioner, the law of procedural bar is a great deal more complicated than the law governing the merits of petitioner's point. Since petitioner cannot prevail on the merits in any event, we see no reason to ring the changes of the various formulas used in determining the issue of procedural bar. The simplest way to decide a case is often the best.

by the Nebraska Supreme Court, and that to execute Rust under those circumstances would be to deprive him of his life without due process. These cases, it seems to us, represent a rather narrow rule: some aspects of the sentencing process, created by state law, are so fundamental that the state must adhere to them in order to impose a valid sentence. We reject the notion that every trial error, even every trial error occurring during the sentencing phase of a capital case, gives rise to a claim under the Due Process Clause of the Fourteenth Amendment. What happened to petitioner here may have been wrong (more about this later), but the mistake, if there was one, was not so central as to be like the errors found in <u>Hicks</u> and <u>Rust</u>.

Petitioner's next argument is that the statement introduced against him was obtained in violation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel. Again, we do not agree. The statement was not the product of interrogation by Officer Johnston. The conversation was initiated by petitioner, at a time when Officer Johnston was at the jail on other business. Petitioner began by stating that there were things about his life he regretted. Officer Johnston, it is true, pursued the matter, in a sense, by asking what those things were, but this inquiry by the officer was instigated and invited by Chambers himself. Immediately thereafter, Chambers made the statement (assuming one believes Johnston's testimony) introduced against him at two of his trials. There is no indication whatever that the statement was not voluntary. We do not think that the law protects petitioner, in these circumstances, against the consequences of a statement that he clearly wanted to make.

The Eighth Amendment argument – that the statement was so inflammatory and emotional as to encourage an irrational response by the jury – may also be disposed of quickly. The Supreme Court of Missouri, in rejecting this argument, cited <u>Simmons v. South Carolina</u>, 512 U.S. 154, 162 (1994), and we believe the citation was apt. The plurality opinion in <u>Simmons</u>, written by Justice Blackmun, clearly states that "a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." And this is true even when the state statute laying out a

capital sentencing procedure does not mandate consideration of a defendant's future dangerousness. "[T]he State's evidence in aggravation is not limited to evidence relating to statutory aggravating circumstances." Ibid. Once a state has proved at least one statutory aggravating circumstance – and there is no doubt that this occurred in the present case – a jury, in deciding what sentence actually to impose, may consider many factors, including future dangerousness.

We turn, finally, to the argument that is probably petitioner's strongest, and to which we have given the most thought. Petitioner contends that his counsel on direct appeal was ineffective in the constitutional sense because he did not argue that the trial court had committed plain error by admitting Officer Johnston's statement in violation of the Missouri statute. This argument is not procedurally barred. Chambers raised the claim in his motion to the Supreme Court of Missouri for recall of that Court's mandate. At the time Chambers filed his motion, claims of ineffective assistance of appellate counsel were properly raised in a motion to recall the mandate, and there was no time limit on the filing of such motions.[5] Clemmons v. Delo, 124 F.3d 944, 953-54 (8th Cir. 1997), cert. denied, 118 S. Ct. 1548 (1998). Because the Missouri Supreme Court denied Chambers's motion to recall the mandate without explanation, the Court's action is presumed to be on the merits. See Harris v. Reed, 489 U.S. 255 (1989). Accordingly, the issue is open for review on federal habeas.[6]

_____

[5]The rule has since been changed. See Mo. Sup. Ct. R. 29.15, as amended on June 20, 1995. Effective January 1, 1996, claims of ineffective assistance of appellate counsel must be raised in the sentencing court, and must be raised within 90 days after the mandate of the appellate court is issued. See generally State v. Kelly, 966 S.W.2d 382 (Mo. App. 1998).

[6]It might also be argued that trial counsel was ineffective for failing to object to the evidence when it was offered. Such a claim would be procedurally barred. The place to raise such a claim, under Missouri procedural law, is in a postconviction proceeding under Mo. Sup. Ct. R. 29.15, and the claim was not raised there. Ineffectiveness or neglect on the part of postconviction counsel cannot be "cause" for purposes of excusing a procedural default. Clemmons, supra, 124 F.3d at 947-48.

A claim of ineffective assistance of appellate counsel is reviewed under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). A petitioner must show that counsel's performance was objectively unreasonable, and that there is a reasonable probability that the outcome of his appeal would have been different if counsel had raised the claim. We assume, as did the District Court, that a reasonably competent appellate counsel would have made this argument. The question then becomes whether there is a reasonable probability that the result of the direct appeal would have been different if the argument had been made. On this issue, the burden of proof is on Chambers. He must show not only that the Missouri Supreme Court would have thought that an error had been made, but also, because no objection was made at trial, that the error was "plain."

In assessing the probability that such an argument would have succeeded, we of course apply Missouri procedural law. Under Mo. Sup. Ct. R. 29.12(b), "[p]lain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." And under Rule 30.20, "[a]llegations of error that are not briefed or are not properly briefed on appeal shall not be considered by the appellate court except errors respecting the sufficiency of the information or indictment, verdict, judgment, or sentence. Whether briefed or not, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." The Missouri courts appear to consider, first, whether an error occurred, then whether that error was "plain," and, finally, whether the error would produce a manifest injustice or miscarriage of justice if it were overlooked. See <u>State v. Bailey</u>, 839 S.W.2d 657, 661 (Mo. App. 1992), requiring that the error be evident, obvious, and clear. Most Missouri cases lay emphasis on the question whether a miscarriage of justice has occurred. See <u>State v. Hall</u>, 955 S.W.2d 198 (Mo. 1997) (en banc). In <u>State v. Hornbuckle</u>, 769 S.W.2d 89, 92-93 (Mo. 1989) (en banc), the Supreme Court wrote that, under plain error review,

[The] appellant bears the burden of demonstrating that the action of the trial court was not only erroneous, but that the error so substantially impacted upon his rights that manifest injustice or a miscarriage of justice will result if the error is left uncorrected. . . . Relief under plain error, therefore, requires that appellant go beyond a mere showing of demonstrable prejudice to show manifest prejudice affecting his substantial rights.

(Citations omitted.)

As we have noted, the probation officer testified that he visited the Jefferson County Jail, where Chambers was being held, shortly after Chambers's first conviction. The officer testified that he had gone there to conduct a presentence investigation in another case, and that he was summoned by Chambers to his cell. According to the officer, Chambers "instigated" the conversation. The District Court held that no error was committed, principally on the ground that the statement was not "obtained" by the officer, because Chambers volunteered it. The District Court also noted there was no evidence that the jail-house conversation "was or became part" of Chambers's presentence report, which did not mention the conversation and which appears to have been prepared before the conversation occurred.

The District Court's interpretation of the statute is plausible, and certainly there is no authority from the Missouri courts that is contrary to that interpretation. Only one appellate court in Missouri has interpreted this statute. In State v. Dale, 874 S.W.2d 446 (Mo. App. 1994), the Court of Appeals assumed that the privilege applied to the facts in that case, although the Court did not decide the issue. We think Dale can be distinguished, however, because the testimony in that case came from officers who were supervising a defendant while she was on parole, and the statements testified to were made during the officers' probation-assessment interviews with the defendant. Here, the officer was at the jail on another assignment, and Chambers called him over

-11-

and volunteered the information. The privilege may well not apply unless the officer solicits the information for the purpose of reporting it to the sentencing judge. Thus, the error of admitting this testimony, if there was one, was not "plain."

We also believe the facts do not show any manifest injustice, as required by Missouri's plain-error standard. Chambers does not claim that he was aware of the statute when he made the statement, or that he believed that the statement would be kept confidential, or that he relied on the statute in any way.

Two other factors are important to us in determining whether a miscarriage of justice, going beyond a mere showing of demonstrable prejudice, occurred here. First, the information was already "out," Officer Johnston having testified without objection at the guilt phase of Chambers's second trial. At the time of the third trial, the information was no longer confidential, and had not been for some time. Whether or not this circumstance amounts to a waiver of the privilege, we think it reduces the injustice, if any, that occurred here. And finally, we are mindful that privileges are not much in vogue these days. They have the effect of keeping from the trier of fact relevant evidence of what actually happened, or, as here, what was actually said. The adverse effect on Chambers's case, if there was one, was the product of his own voluntary act. On balance, we think it unlikely that the Supreme Court of Missouri, if it had undertaken plain-error review on this point, would have reversed the sentence.

Chambers has not persuaded us that there is a reasonable probability that he would have won his direct appeal if counsel had made the argument in question. We agree with the District Court that no prejudice in the Strickland sense occurred as a result of appellate counsel's failure to seek review of the statutory issue.

IV.

Chambers next argues that his trial counsel was ineffective in failing to interview and present the testimony of Dr. S. D. Parwatikar. We believe this claim was adequately reviewed by the District Court, and we find no error.

Dr. Parwatikar performed a court-ordered mental evaluation of Chambers prior to his first trial, and concluded that he suffered from situational depression and may have acted impulsively, rather than deliberately, following provocation by the victim. Dr. Parwatikar testified to these conclusions during the penalty phase of the first trial, although he acknowledged that Chambers was mentally able to conform his conduct to the law. The doctor's report also recounted that Chambers had suffered a head trauma as a child, and had been diagnosed as borderline mentally retarded. Chambers argues this testimony should have been presented during the guilt phase of the third trial, because it would have negated the State's claim that he acted after deliberation, leading the jury to convict Chambers of a lesser-included offense. Or, Chambers argues, the testimony would have altered the balance between the aggravating and mitigating circumstances presented during the penalty phase, and the jury might have decided to sentence him to life imprisonment instead of death.

The State argues that Chambers's counsel made a strategic decision, after investigation, not to call Dr. Parwatikar. Trial counsel explained during the postconviction hearing that she had reviewed Dr. Parwatikar's testimony from the first trial and determined that he did not stand up well under cross-examination. The District Court also noted evidence that likely would have come out on cross-examination. There were psychological evaluations contrary to Dr. Parwatikar's, and his own report contained statements attributed to Chambers that he knew that Oestricker had been "obnoxious" and had "assaulted" his friend Jack Turner, and that Chambers had "decided to meet" Oestricker because he "wanted to make peace" between Turner and Oestricker. This explanation would have conflicted with Chapman's testimony that

Chambers was simply looking for a boat, and that there had been no plan to confront Oestricker. In addition, as the Missouri Supreme Court pointed out, Dr. Parwatikar's testimony did not prevent the jury in the first trial from imposing the death penalty, and none of Chambers's counsel in three trials had presented the doctor's testimony during the guilt phase.

Having reviewed the evidence, we believe the District Court correctly held that Chambers's trial counsel was not ineffective in failing to present Dr. Parwatikar's testimony.

## V.

Chambers also complains that his counsel ineffectively impeached Fred Ieppert, a witness for the State who provided some of the most damaging testimony against Chambers. Ieppert testified, <u>inter alia</u>, that Chambers, after challenging Oestricker to join him in settling their dispute outside, stopped and "checked" his gun to make sure it was loaded, suggesting premeditation. Ieppert had not previously testified to this, despite having given a statement to the police after the murder, and having testified during both previous trials and a preliminary hearing. There were other variations between Ieppert's testimony at the third trial and his earlier testimony, including how much time passed between Chambers's departure from the bar and the firing of the gun. As the Missouri Supreme Court noted, Ieppert was a difficult witness because of his age and hearing problems, and care had to be taken not to alienate the jury with an overly aggressive cross-examination. The District Court held there was no prejudice, and we agree. Any possibility that a few more questions asked of Ieppert would have produced a different result is remote.

## VI.

Justice Stevens, in a memorandum opinion respecting the denial of certiorari in Lackey v. Texas, 514 U.S. 1045 (1995), questioned whether executing a prisoner who has spent many years on death row constitutes cruel and unusual punishment prohibited by the Eighth Amendment. Chambers, with 15 years on death row, argues that it does, and that his is an appropriate case in which to examine the issue.

The State has a preliminary argument, however: that the Lackey claim is procedurally barred because it was never raised properly in the state courts. We agree with this argument. Nothing resembling the Lackey claim was made at trial, on direct appeal, or in postconviction proceedings following Chambers's third trial and conviction. The claim was included in petitioner's motion to recall the mandate of the Missouri Supreme Court on direct appeal, but we do not think that such a motion is a proper vehicle, under Missouri law, for raising this sort of claim. "Such a motion may . . . be employed when the decision of a lower appellate court directly conflicts with a decision of the United States Supreme Court upholding the rights of the accused." State v. Thompson, 659 S.W.2d 766, 769 (Mo. 1983) (en banc). But there of course is no decision of the Supreme Court of the United States holding that delay in execution violates the Eighth Amendment. There is only an opinion by one Justice indicating that the issue deserves consideration, plus a notation by another Justice that the issue is important and undecided. We hold that Chambers's Lackey claim is procedurally barred. Petitioner suggests that the argument was novel, which might amount to cause for his not having made it earlier, but this argument cannot stand. Prisoners have been making the delay argument for years, always without success.

Notwithstanding this clear obstacle, which is sufficient to dispose of this argument, we deem it appropriate to add a few words with respect to the substance of the Lackey point in this case. We do so because of the respect that we owe to the

foreign courts that have accepted this argument, or some variation of it, under their own legal systems.

The argument has met with some success, especially in the British courts, where the issue arises principally because the Judicial Committee of the Privy Council is still the highest court of appeal for many Commonwealth countries. See generally William A. Schabas, "The Death Row Phenomenon," pp. 96-156, The Death Penalty as Cruel Treatment and Torture: Capital Punishment Challenged in the World's Courts (1996). In a 1993 case, the Privy Council recommended to the Crown that the death sentences of two appellants be commuted to life imprisonment, concluding that executing them after almost 14 years on death row would violate the Jamaican Constitution. Pratt v. Attorney General of Jamaica, [1994] 2 App. Cas. 1, [1993] 4 All E.R. 769 (P.C. 1993). Regarding other prisoners who were then awaiting execution in Jamaica, their Lordships said that "in any case in which execution is to take place more than five years after sentence there will be strong grounds for believing that the delay is such as to constitute 'inhuman or degrading punishment or other treatment.' "[7] [1994] 2 App. Cas. at 35, [1993] 4 All E.R. at 788-89 (P.C. 1993).

The Privy Council in Pratt overruled its earlier judgment in Riley v. Attorney-General of Jamaica, [1983] 1 App. Cas. 719, [1982] 3 All E.R. 469, 35 W.L.R. 279 (P.C. 1982). The dissent in Riley had written that "there is a formidable case for suggesting that execution after inordinate delay would have infringed the prohibition against cruel and unusual punishments to be found in section 10 of the Bill of Rights [Act of] 1689." [1983] 1 App. Cas. at 734, [1982] 3 All E.R. at 478 (P.C. 1982) (Lord Scarman, dissenting, joined by Lord Brightman). That section of the English Bill of Rights is "undoubtedly the precursor of our own Eighth Amendment," Lackey v. Texas,

---

[7]Section 17(1) of the Jamaican Constitution provides that "[n]o person shall be subjected to torture or to inhuman or degrading punishment or other treatment."

514 U.S. at 1047 (1995) (opinion of Stevens, J.), though delay in the execution of sentences was hardly a problem in 1689.

The ruling in Pratt was followed by similar rulings. In a case arising in Belize, the Privy Council recommended that the death sentence of an appellant be quashed, and the case remitted to the Court of Appeal of Belize for sentencing on the substituted charge of manslaughter, at least in part because the appellant had already served three years on death row. Logan v. The Queen, [1996] App. Cas. 871, [1996] 4 All E.R. 190, [1996] 2 W.L.R. 711 (P.C. 1996). And in Henfield v. Attorney-General of Bahamas, [1997] App. Cas. 413, [1996] 3 W.L.R. 1079 (P.C. 1996), overruled in part by Fisher v. Minister of Public Safety and Immigration, [1998] 3 W.L.R. 201 (P.C. 1997), the Privy Council recommended the commutation of death sentences for two other appellants, one of whom had served almost seven years on death row. Lord Goff of Chieveley wrote that

> "their Lordships have had to form a judgment as to the period which should be held to constitute [an average period of acceptable delay between sentence and execution] and, having given the matter careful consideration, have concluded, taking into account an appropriate period of time for the domestic appeals available to condemned men in their own interest, that a period of [three and a half years] in prison awaiting execution, with all the agony of mind which that entails, would in all the circumstances be so prolonged a time as to render execution cruel or inhuman punishment."

[1997] App. Cas. at 429, [1996] 3 W.L.R. at 1092 (P.C. 1996).

In Soering v. United Kingdom (App. no. 14038/88), Series A, Vol. 161, p. 54, the European Court of Human Rights cited delay as the principal ground for its decision that allowing the extradition to the United States of a German citizen, arrested in

England and charged with capital murder in Virginia, would violate the European Convention on Human Rights. The Court found that it was likely that Soering, if extradited, would be sentenced to death, and held that the six to eight years a Virginia inmate must spend on death row before being executed would violate Article 3 of the Convention, which provides that "[n]o one shall be subjected to torture or to inhuman or degrading treatment or punishment."

The essential point for our purposes, of course, is whether or not the Eighth Amendment is being violated. We believe that delay in capital cases is too long.[8] But delay, in large part, is a function of the desire of our courts, state and federal, to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life. Chambers's strongest argument is that the State has had to try him three times before getting it right. That is true, but there is no evidence, not even a claim, that the State has deliberately sought to convict Chambers invalidly in order to prolong the time before it could secure a valid conviction and execute him. We believe the State has been attempting in good faith to enforce its laws. Delay has come about because Chambers, of course with justification, has contested the judgments against him, and, on two occasions, has done so successfully. If it is not cruel and unusual punishment to execute someone after the electric chair malfunctioned the first time, see <u>Louisiana ex rel. Francis v. Resweber</u>, 329 U.S. 459 (1947), we do not see how the present situation even begins to approach a constitutional violation. Petitioner's argument is without merit.

---

[8]The average length of time served between sentence and execution for the 45 persons executed in the United States in 1996 was ten and a half years. See Bureau of Justice Statistics, <u>Capital Punishment, 1996</u>, Time Under Sentence of Death Sentence and Execution, by Race, 1977-96, p. 12, Table 12.

VII.

Chambers argues that the Missouri Supreme Court failed to conduct an adequate proportionality review of his sentence as required by Missouri law, and that the Court has failed to maintain the data necessary to conduct a meaningful review. See Mo. Rev. Stat. § 565.014 (1978), amended and recodified at § 565.035 (1984). Our Court has repeatedly rejected this kind of argument. See Kilgore v. Bowersox, 124 F.3d 985 (8th Cir. 1997), cert. denied, 118 S. Ct. 2352 (1998); Bannister v. Delo, 100 F.3d 610 (8th Cir. 1996), cert. denied, 117 S. Ct. 2526 (1997). The Missouri Supreme Court did review Chambers's sentence, and concluded that it was proportionate, State v. Chambers, 891 S.W.2d at 113-14, and we cannot look behind that determination.

VIII.

Chambers's final argument is that he should have been allowed to present other claims in this appeal without having first obtained a certificate of appealability. The basis for this argument is the Supreme Court's recent decision in Lindh v. Murphy, 117 S. Ct. 2059 (1997). In Lindh, the Court held that certain provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, do not apply to habeas petitioners whose petitions were filed before April 24, 1996, the effective date of the Act. Chambers's petition was filed on April 21, 1995, and was denied by the District Court on March 12, 1997. He filed a notice of appeal on July 16, 1997. He argues that the Act does not apply to him because his petition was filed before the effective date of the Act. This argument is foreclosed by our recent opinion in Tiedeman v. Benson, 122 F.3d 518 (8th Cir. 1997). In Tiedeman, we held that the certificate-of-appealability requirement does apply to cases in which a petitioner's notice of appeal was filed after April 24, 1996. Chambers's petition, therefore, must comply with the certificate-of-appealability requirements of the Act, and he may not raise claims on appeal for which a certificate has not been issued. In

-19-

addition, Chambers's brief does not explain why any of the additional arguments he seeks to raise would have merit.

IX.

For the foregoing reasons, the District Court's denial of the petition for writ of habeas corpus is

Affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT